Case number 18-3916 Ty Shanaberg v. Licking County OH at all. Oral argument not to exceed 15 minutes per side and Mr. Schwartz for the appellant when ready. Good morning. Good morning. May it please the court, Adam Schwartz for appellant Ty Shanaberg. I reserve two minutes for rebuttal. Seven years ago, a panel of this court said that it was excessive force to tase a suspect that had already surrendered on their knees, open hands in the air. The district court below agreed with that result, and indeed in this case, Ty Shanaberg was on his knees, hands in the air, when he was tased. But the district court went on to say that this case was different for two reasons. First, because the officer thought there was immediate threat of a weapon. And second, because Ty actively resisted arrest. Because neither distinction is supported by either the law or the facts, this court should reverse. Turning to the first distinction, the court below said that Ty was an immediate threat of a weapon. But we think that the videotape itself, indeed the videotape itself alone, resolves that argument in Ty's favor. I don't think there's any dispute that the videotape shows that at the time he was tased, his open hands were in the air. And this court has been clear to draw a distinction between which beliefs are reasonable of a threat and which beliefs are not, based on the suspect's hands at the time of the tasing. What about when he reached for the truck? When he reached for the truck, yeah, that's the key distinction. So when he reached out for the truck, if he had been tased at that moment, at that time, it would absolutely be immediate threat of a weapon. It would have been reasonable. The officer would have been wrong because he wasn't reaching for a weapon. So you're saying, so you agree that he, they had just tased him right then and there? Absolutely. Yeah, and that's the Jackson case, that's McGee. There's three or four decisions that hold that point. They're either reaching in their waist, they're reaching for a bag. Absolutely, so yeah, so if this case was him reaching at the time of the truck, we lose all the way down. We're not here. But here, the officers repeatedly asked him to get out of his belly, and I assume they wanted him on his belly so they could handcuff him from his back. And I think it's only natural that a suspect that's handcuffed would be less likely to have access to his weapon. Why is it unreasonable for them to request him to get out of his belly so they can do that, so they can enforce him safer for the weapon? The request itself is reasonable. There's not a dispute about that. Okay, and he refused to file a reasonable request? No question. Okay, why doesn't that permit the officer to use the taser, that he refuses a reasonable request? And even though he may not be resisting arrest, he's refusing a reasonable request. Two separate reasons. We can jump, just to be clear, I'm going to jump away from the threat component of the weapon, and we're going to shift now to the resistance. The officer thinks he's armed and dangerous, that's what he's been told. Okay, so the officer does not think that the suspect is armed and dangerous. He doesn't? No. I thought that's what the report was. No, no. Okay, what were they told then? So let's draw two distinctions. Number one, the officer was told on the car radio on the way over that the suspect may be armed and dangerous. May be? Yeah. Oh, okay, so he was told he may be armed and dangerous. That's correct, and so this is an important distinction. We went either way. Okay, well, the officer – I mean, I'm looking out for the safety of the officers. Sure. I mean, we have enough officers that have been killed in the line of duty here, and you don't think that's enough that the officer thinks he may be armed and dangerous? No. To take precautions, that he has to know he's armed and dangerous? No, no, he doesn't have to know. So in all the cases that deal with this gun issue, there's – whether they hear that on the car radio on the way over, whether they actually see a weapon, maybe they don't see anything. What it takes to actually – once you're on the scene, there has to be some action by the suspect to indicate that there's an immediate threat of a weapon to the officer's safety. So what – Why should you have that to safely presume that you have to know there's a present threat? I mean, that's what they want to do. They want to frisk him for weapons safely. And to me, they want him to get on his belly because that's the safest way to find out if he's got a weapon on him. I mean, he's up like this, but they approach him. He easily can reach for a weapon and perhaps kill the officer. And that's – As they approach him. But if he's on his belly, his hands behind his back, it's a lot harder for him to get access to those weapons, right? And that's in every case, Your Honor. Yeah. Why should we look out for the safety of the officer here? Because your decision, including – your decision, Your Honor, in Thomas v. Plummer says exactly the opposite. Okay. So the decision of Thomas v. Plummer, Correa v. Simone, those are the two clearest cases where we have the exact same situation. Suspect on their hands and knees, hands in the air. The officer says, get on your belly or you're going to be tased. Again, all for the same reason, you know, for the safety of the officer. But, Your Honor, but how many cases involve the suspicion that the person is armed or has a gun? Is Correa the only one where there was a denial of qualified immunity even though there was a suspicion that the person was armed? Yeah, I don't think Thomas – I don't think the officer's body may be armed today because I don't think that was the case. I mean, in Thomas, she is suspected at most of obstructing official business or something, so not a car thief, not intoxicated. Right. There's no question about whether she's armed or not. I mean, it's a slightly different case than this one, it seems to me. Correa may be the better case for you, Your Honor. On the threat issue, you're absolutely right. Correa is exactly on point. Car, radio, on the way over, may be armed. The court said it doesn't matter. Let me ask you this question. What should the officers have done? In other words, they're asking him or commanding him to do something. He's saying no, which I think we've said just verbal resistance is not necessarily active resistance, right? Right, noncompliance is not enough. What should the officers have done at that point? It's a good question because what we would normally do is look to the policy of the county to figure out what they would have done. And the policy doesn't specify at all what should be done. And that's part of why it's unconstitutional because it authorizes just from the mere moment of noncompliance. If they give me an order, whatever it is, I ignore it. At that point, you're encouraged to case regardless of the circumstances. And so arguably this – that – I can see how in some circumstances that would be unconstitutional. If you said take your hat off, for instance, and he says I'm not going to take my hat off to an SOB like you. And they say, well, take your hat off. And then he refuses and then he takes them. That's different from this case in my view apparently because what he's asking the person to do is to get into a safer position. Or is that not true? I mean the person with his hands up in the air, that's safer than having his hands in his pocket or his hands reaching for the truck. But it's not as safe as if he was down on his belly. Would you agree with that or not? Sure. I mean it takes a few seconds to get up off the ground. If you're already on your knees, you're a lot closer to the place where a gun might be. Yeah, I don't want to confuse the issues. So they're asking him – and I think this is, Judge Albandian, the thrust of this question from my perspective is they're asking him to do something that's reasonable from the perspective of the safety of the officer. And he says no. Whereas in Thomas, he told this person to get on the ground or she would be tased and she then sank to her knees and then she was tased. Right, same exact situation. Well, it seems extremely different though to me. You can say it's the same. It's different because there's no instance of you get to this safe position or I'll tell you, she got down on her knees. No, Your Honor. She holds her hands above the head. I understand that. Yeah, they're both in the exact same position, on their knees. But the request is different. The request is the exact same. Get on the ground. Exactly the same. Exactly the same in Korea. The Korea versus Samoa. Exactly the same. Goodwin. She says no. Elridge. They're all the same. She says no in that case. I won't get on the ground. Say the word no. Say the word no. But that's never been a distinction in any particular case. It seems to me that if you're – I guess it's the same question. I'm just repeating it. What are they supposed to do? If they legitimately can ask them to get into a safe position and they say no, then they're told again and they say no, then they're refusing to get in a position that's safer with respect to the policeman and you want us to say that's unconstitutional. This court has said it at least six or seven times. And that's absolutely right because what other policies and other jurisdictions do is there are other remedies that are available. If they don't get on the ground, put them on the ground with your hands. If they don't put their hands behind their back. You have to apportion them. You do. And this court has never said that the failure to comply is a green light to taste. That's passive resistance plain and simple. But refusal to comply to get in a safer position. Passive resistance. Is passive. Is passive. And that is – and to taste somebody for passive resistance. Can you read the cases differently though? It's unconstitutional. Gotcha. Thank you. Thomas versus Plummer. That's an unpublished case. It is. It was adopted in Kent, which is a published decision. What were the facts in that case? In Kent? Kent was a refusal to comply with the officer's request, again, to get down on the ground. He was told to calm down. He said no. They tried to touch him. He said don't touch me and physically resisted. And the court said that that was not enough. That his failure to comply with those instructions were not – even if he was verbally said no. Same thing as Goodwin. Same thing as Elridge. Just saying no and not complying is not enough to taste. There has to be something more. There has to be physical resistance. There has to be hostility, threats of violence, something that rises just above passive resistance. So, again, this case lines up quite clear with all the cases. The position and the orders are all the same. How do the other factors figure into it too? So it's passive resistance, but the crime that he's suspected of is more serious. I'm looking at the other factors from Grant. So how do we mix – how do we put the factors together in the same analysis? It's not a mathematical formula, of course, but you do consider the totality. In this case, not only do you have the noncompliance with an order, reasonable or not, it's still noncompliance. The order is reasonable. So we have noncompliance, but you also have three armed officers versus one individual. That one individual is not armed. Well, do you think he's armed in danger? That's the distinction, I think, that we have in this case that you don't have in the other cases. Let me tell you why. You say that, well, you don't have a – okay. Tell me why that doesn't make a difference. I will. Well, not that it doesn't make a difference. So there's an issue, let's start with, but you've got to get two steps about whether this gun issue, the threat issue, right? One, is it a reasonable belief that there's an immediate threat of a weapon? Yes. Well, there is. I mean, it's reported that he may be armed and dangerous, so they – some of these aren't in danger. That's the distinction I want to draw to you, Your Honor. The report that he's armed and dangerous is knowledge that he may be armed and dangerous. Okay? But at the time of this case, which is where we measure these Fourth Amendment cases, when we look at that moment, his arms have been in the air for 19 seconds, open hands. And again, I know it's reported in other cases, but in six or seven cases they say when a suspect's open hands are in the air, there's no reasonable belief that I have a gun in my hands when I'm like this. Not his hands, but on his possession, and that's what they're worried about. They don't know where the gun might be on his body, and hands in the air easily have access to the gun, as opposed to when you're out in the valley with your hands behind your back. It's much more difficult to reach for the gun. You say there's not a case? Three of them. Maybe this will be the case. Yeah, well, three versus one is the exact same if you look at that case. Okay. The same position, same order, same radio call, saying he might be armed and dangerous, exact same. Three versus one is your case. But to be clear, there's no evidence that this officer actually believed that there was a threat. Isn't that the objective belief rather than subjective? It's objective, but what are the objective facts that he had? At the time he was tased, Your Honor, his admission, he said, get on the belly or you're going to be tased. He admitted afterward you were tased because you didn't listen to our commands. The reports all say he was tased because he didn't listen to our commands. And the use of force report says he was only tased because he didn't resist commands. There's not one single piece of evidence, objectively or subjectively, that an officer thought at the time he was tased that he had anything in his hands or that an immediate threat wasn't the issue at all. There's simply no evidence to even get there. Okay. You've got your two minutes to follow these news anomalies. I will reserve, Your Honor. Thank you. Any further questions at this time? Good morning. Good morning, Your Honors, and may it please the Court. My name is Stephanie Schoolcraft, and I represent the appellees, Deputy Brian Stetson, Deputy Jessica Mills, Deputy Michael Zweigel, and Lincoln Cannon. And preliminarily, Your Honors, I will not be addressing appellants' failure to intervene claims against Deputies Mills and Zweigel because he waived his right to a public review of those claims. But this Court should uphold the lower court's decision, finding Deputy Stetson is entitled to qualified immunity in dismissing an appellant's manel claim against Lincoln County for two reasons. First, it was objectively reasonable for Deputy Stetson to tase Mr. Schanenberg because he was actively resisting arrest, and Deputy Stetson is entitled to qualified immunity because he did not violate Mr. Schanenberg's clearly established constitutional rights. And second, Lincoln County cannot be liable to Mr. Schanenberg because there is no underlying constitutional violation, but even if there was, Lincoln County's use-of-force policy was not the moving force behind any constitutional violation. And Deputy Stetson didn't use excessive force when he tased Mr. Schanenberg on January 2, 2015. Your Honors have already highlighted some important facts, but I want to review those again. On the day in question, the deputies were dispatched on a call of someone who was suspected to be driving while intoxicated. While they were onward to the call, there was an eyewitness who had been following the vehicle, gave dispatch the license plate number, and it came back as a stolen vehicle, and that the suspect should be considered armed and dangerous. What was that? Just because he—was there anything specific about him or this truck, or did they run the plate through the system and whoever the owner was had a concealed carry or something? What was the—is it just something they always say, like, anybody may be armed and dangerous? No, Your Honor. In this circumstance, there was Mr. Schanenberg himself. His vehicle had been stolen, and the person who stole the vehicle had been walking around the neighborhood yielding a weapon. He was known to the police as somebody who was violent. He was somebody who mentioned things about using violence to ensure he would not be captured. And Cushockton County, who is no longer a party to this case, they—once the vehicle was recovered, they inappropriately reentered the vehicle back into Leeds as not recovered, so the officers from Licking County only had the information that the suspected driver of the vehicle was this other individual. The same individual who was the one who did that? Correct. Yes, Your Honor. And they also suspected Mr. Schanenberg was highly intoxicated. At the time that the officers eventually caught up with Mr. Schanenberg, it was on a dark, rural gravel road at night. The only illumination available to the scene, which you will see in the video, is from the officers' cruiser lights. And the deputies, because of their belief that Mr. Schanenberg was this armed and dangerous car thief, conducted a felony stalk on the vehicle. And between when deputies stepped in, got out of the car, and ordered Mr. Schanenberg to get down on the ground and actually deploy his taser, just 31 seconds elapsed. And in those 31 seconds, Mr. Schanenberg did absolutely nothing to dispel the officers' belief that he was armed and dangerous. And, Your Honor, Mr. Schwartz was incorrect when he said there is nothing in the record to establish that the deputies believed that Mr. Schanenberg was armed and dangerous. In fact, there are affidavits from both Deputy Mills and Deputy Stetson establishing that they believed he was, in fact, armed and dangerous. And one of those citations is Doc 54-2. So what do you do when, in Korea, the guy was thought to be armed, but then at the time that they tased him, he was in a submissive position, and we said he wasn't actively resisting arrest, he's submissive. There was a belief that he was armed at one point, but once you're in this submissive position, you can't tase the person. Well, Your Honor, Korea is factually distinguishable because in that case, there was a factual dispute as to whether the suspect was actually resisting arrest. In that case, the body cam or the cruiser cam that was at issue there depicting the event did not actually have a recording device to pick up the audio. Okay, maybe I'm lost here. How was Mr. Schanenberg actively resisting arrest? I mean, viewing it in a light that was favorable to him. What's the active resistance? By refusing to comply with officer commands, verbally telling him that he would not comply with his orders. We've said that just verbally refusing to do something is not active resistance, right? It has to have some outward manifestation of resistance, right? Something physical, something else, right? Yes, Your Honor, but he also reached towards his truck, which he could have reached in and grabbed a weapon. And also, this court has said that disobedience of a police officer's order is active resistance, and that's what we have in this case. Just verbal disobedience? Which case is that? It is Redliff v. Valesky. Its active resistance includes struggling with, threatening, or disobeying officers, and that's 791-Federal-Cert-638. It was decided by this court just four years ago. And, you know, counsel, candidly, the difference between whether something is active or passive is something in the minds of academics, right? But what I'm concerned about, and I think we're reasonably familiar with the facts of this case, but your opposing counsel says cases bind us to reach the conclusion that this was unconstitutional, or at least it could have been unconstitutional such that it should go to a jury. How do you distinguish those cases? In fact, not by saying, oh, well, it's this, and therefore it's active, or it's this, and therefore it's passive. But in terms of the facts of those cases, how are those cases distinguished? B-sides and cases. Well, the cases— Tell me any insight, Correa, I'm wondering. So the Thomas v. Plummer case, and the Goodwin v. City of Painesville case, the Kent v. Oakland County case, and the Eldridge— Yeah, and I'll do them one by one and tell me why they're different. Sure. In the Thomas v. Plummer case, the individual who was tased was the passenger in a vehicle who was not suspected of any crime. That is completely different here, where we have an individual who was— Is that the only difference? No, Your Honor. There are additional differences, because once that individual was out of the vehicle, she did not offer any blatant opposition to the officer's commands. She did not tell the officer no. She merely said, what did I do? Her arms were also raised above her head during the entirety of the stop. Mr. Shandler's arms were not raised above his head during the entirety. His hands actually moved down to waist level. Additionally, the officer in that case walked around the suspect and tased her in the back. In this instance, none of those facts are here. Okay. Additionally, in Kent v. Oakland County, first of all, the tasing occurred inside the suspect's home. The suspect was not suspected of committing any crime. In fact, the officers were there because the suspect would not allow EMS to resuscitate his father, who had a DNR, and he had a do-not-resuscitate order. And it was in the home, and he was backed up against a wall with his hands up in the air. He was not suspected of being armed either, and that is completely different than here. Coretta, in that instance, the suspect was not actually suspected of committing any crime. There had been a call for someone being at a bar with an assault rifle. A plaintiff, the suspect in that case, was stopped because he matched a physical description. And in that case, the suspect said that he was verbally complying with all of the officer's commands. And as a result, the officer in that case had to concede, for the purposes of summary judgment, that there was no resistance at all. No resistance. And in this case, as Your Honors have said, even if it was just passive resistance, there was still resistance. But there was also resistive dialogue that Mr. Schanenberg engaged in that Coretta said that he did not engage in. And Your Honors have that video to establish that evidence. And that is why this is totally different than the cases that Mr. Schwartz cites. The other cases he cites, Goodwin v. City of Painesville, there was no suspicion that the individual had a weapon. Eldridge v. City of Warren, the same instance. And as Your Honor, Judge Griffin, you recognize that these officers have an interest in ensuring that the suspect that they're engaging with is not armed. And in this case, Mr. Schanenberg gave these officers no opportunity to ensure that they were not armed. He simply points to the fact that there was no weapon within viewpoint. However, an officer can reasonably believe that there's a presence of a weapon, even if the weapon is not drawn. Because as Judge Griffin recognized earlier, it takes very few seconds, if maybe just one second, for someone to draw a weapon. But even if this court does not find or finds that Mr. Schanenberg or that Deputy Stetson violated Mr. Schanenberg's constitutional rights, they cannot establish that this is clearly established law. The Sixth Circuit has said it is not clearly established that a suspect has no clearly established right to resist arrest that can defeat qualified immunity when a suspect refuses to follow police orders and may be in possession of a weapon. This court, Sixth Circuit, reaffirms that principle just two years ago in Jackson v. Washtenaw County, which Mr. Schwartz referenced earlier. However, he was wrong about the facts in that case as well, because in that case, the suspect did not make any overt movement towards a weapon. He merely had his arms at waist level, which at the time Mr. Schanenberg was tased, his arms were at waist level as well. However, that goes more towards whether or not the action itself constituted excessive force. Here, the suspect refused to follow Deputy Stetson's orders by getting on his belly. He refused to do that verbally five separate times. He was ordered to do so nine separate times. And the only evidence in the record establishes that the deputies believed that he was in possession of a weapon. Are there cases that say that verbal resistance, verbal defiance, is active resistance and he could be tased for that? Your Honor, there are cases that verbal defiance coupled with noncompliance within officer's orders is considered active resistance. Yes. Which one? You went to the case before. That is Jackson v. Washtenaw County, Your Honor. It seems to me to be – it would be clearer in my mind not to say – not to say how active the refusal to comply is, but to look at what their – what the request is that they're refusing to comply with. Here, the request that they're refusing to comply with would have put the officers in a safer position. Absolutely, Your Honor. I agree. And that goes to the totality of the circumstances. So I'm just – I'm just concerned with the way you phrase it. If we adopted that, it would be broader than it needs to be. If you just say – if they say no five times, well, then that's active resistance or whatever active means. Well, Your Honor – All we would have to say in this case to agree with you, I think, is that it's a different situation when the action that the person repeatedly refuses to do is get in a position that's relatively safer for the police. I agree. I agree that that standard here would put Mr. – or Deputy Stetson's case reviews within the confines of constitutionality. And I also think that it goes towards the totality of the circumstances, which is one of the things that the court must assess. And here, the totality of the circumstances show that Mr. Jandberg would not get into one of those positions to allow them to ensure he did not have a weapon. He never acquiesced in that position. And for that reason, Deputy Stetson is entitled to qualified immunity on that claim. And then to briefly address the Licking County's use-of-force policy, the district court correctly concluded that because there is no underlying constitutional violation here, there can be no manel liability. But the use-of-force policy is constitutional. The sheriff's office is an accredited agency. It's accredited by the Commission on Accreditation for Law Enforcement Agencies called CALEA. CALEA's purpose is to develop appropriate policies for law enforcement agencies around the country. It's a sought-after accreditation. Agencies spend years and many resources achieving this. And all Licking County Sheriff's Office policies must be compliant with CALEA's required standards and are reviewed by CALEA prior to implementation. And importantly, no CALEA policy has been found to be facially unconstitutional by a federal court. And Licking County's policy is compliant with the Constitution. Mr. Schwartz encourages you to look at one sentence from a policy that's 10 pages long and contends that this one sentence shows the policy is unconstitutional. But it completely ignores that the policy directs officers to determine what force to use as the situation progresses, which is consistent with the analysis that officers have to look at the totality of the circumstances. It encourages officers to only use the force that is necessary. And for that reason, we ask that this court affirm the lower court's judgment, finding that there is no liability for Licking County. Thank you, Your Honors. Any further questions? Mr. Schwartz, two minutes to go. Your Honor, with regards to the threat of a gun, I find the position of Licking County troubling for this reason. If we're going to assume that a report over the radio that a suspect may be armed and dangerous is by itself enough to justify the tase of somebody, I suggest what would stop the police officers in this case from tasing Ty as soon as they got there, as soon as they get on the scene? She's arguing – she's saying that when you combine the fear that he's armed and dangerous with his noncompliance, his outward defiance, the fact that he's possibly intoxicated and had stolen this vehicle, we consider all of that, right? You consider all of that, but it's not relevant to whether he has a weapon in his hand when his open hands are in the air. And I'll just point – regardless – Why does it have to be his hands? Because he has a weapon on his body. He's dangerous, isn't he? Because the threat of a weapon is an immediate threat of a weapon. Okay. I think it's immediate if it's on his body. Look – look – I mean, it has to be his hand. Yes. Yes. Okay. I don't think that's the law. I'll tell you – and you can read these cases for us. Okay. Well, we can decide the cases too. Sure. Korea says otherwise. EV says otherwise. Aldrich says otherwise. They all say otherwise. When you have cases where you can't see their hands, it's reasonable to think that there may be a weapon, regardless of whether there's a rumor, whether you see a weapon or not. If you can't see the hands, open for debate. I'm not aware of any case – any case, Your Honor – where a suspect was fully submitted and had open hands in the air for say – even with your open hands in the air, I think you might have a weapon. No case has ever, ever held that. What if the – To the contrary. What if the suspect is standing next to a container or a box or a bureau or something, and the policeman thinks there's a weapon in that container, tells him, move away from the box? You can certainly tell him to move away from the box. And he says, no, I'm not going to do that. So you tell him again, move away from the box. But that way there's a reasonable threat that he's – Well, but – He doesn't have it in his hand. No, you're exactly right. But the proof that you have at the time he was staged is that he thinks that there's a weapon. Well, here they – No. Here they think there's a weapon in his body. No, but they also think he might have it in the car that he reached for. You have no facts to support that, Your Honor. And here's why. But I'm not suggesting that they had any facts. I'm suggesting that he may have been concerned about that, with reasonable basis for concern about that. He could have been. But the point is he wasn't. The point is he wasn't. You look at the – Why was I tased? Why did you tase me? Because you didn't comply with my instructions to get down to your stomach. But those instructions – Why were you tased? You didn't comply with my instructions to move to a safer position. That's the problem I'm having in your position. Okay. Any further questions? No. All right. Thank you, Mr. Swartz. The case will be submitted. I believe that concludes the oral –  – documents. The oral documents. Thank you. Thank you.